**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

Taylor Made Express, Inc.,

        Plaintiff,

        v.

Brandy Kidd, *et al.*,

        Defendants.

Case No. 21 C 2903

Judge Jorge L. Alonso

## <u>Memorandum Opinion and Order</u>

The parties have filed several motions, which the Court resolves as follows and as explained below:

- The Court grants Defendants Coreen Beeks, David Craig, and Laura Montanez's motion for summary judgment (ECF No. 127);

- The Court grants Defendant Hurley Logistics, Inc.'s ("Hurley") motion for summary judgment (ECF No. 128);

- The Court grants in part and denies in part Defendants Brandy Kidd and Top Shelf Expediting, LLC's ("Top Shelf") motion for summary judgment (ECF No. 137);

- The Court denies Plaintiff Taylor Made Express, Inc.'s ("TME" or "Plaintiff") motion for partial summary judgment (ECF No. 147);

- The Court grants in part and denies in part Plaintiff's motion for finding of contempt and for sanctions (ECF No. 142);

- The Court grants Defendant Kidd and Top Shelf's motion to exclude expert testimony (ECF No. 140); and

- The Court denies Plaintiff's motion for leave to file certain documents under seal (ECF No. 194).

## Background[1]

Plaintiff TME is a trucking company based in Milwaukee with both carrier and broker authority. (PSOAF[2] ¶ 1.) TME, Top Shelf, and Hurley all use the "Sylectus" software system to make bookings and maintain relationships with customers and carriers. (PSOAF ¶ 11.) TME's Sylectus information is password-protected, with passwords issued to TME employees and independent contractors as needed. (PSOAF ¶ 66; DSOF ¶ 38.) TME revokes an employee's passwords upon separation. (PSOAF ¶ 66.) TME also requires a password to access its computer system, and uses firewalls and security software. (PSOAF ¶ 69.)

TME does not require its employees to sign any restrictive covenants, non-competes, or confidentiality agreements, but does have an employee handbook which forbids the "[u]nauthorized use, theft or disclosure of the Company's confidential information." (DSOF ¶¶ 23–25, 28.) However, the handbook does not define confidential information, nor did TME define what its confidential information comprises during the events described below. (*Id.* ¶ 30, 35.) TME also works with independent contractors, who have access to TME's purported trade secrets (including customer information, Sylectus reports, pricing information, and information

---

[1] The following background is taken from the statements and responses the parties have submitted under this District's Local Rule 56.1 and the uncontroverted factual record. These facts are either undisputed or generally presented from TME's point of view as the non-moving party for Defendants' pending motions for summary judgment. However, the Court views the facts relevant to TME's pending motion for partial summary judgment in the light most favorable to Kidd as the non-moving party.

[2] "PSOAF" refers to Plaintiff's Combined Statement of Additional Facts, which are combined with Defendants' Joint Response as ECF No. 214.

regarding profit margins) but are not subject to any employee handbook, restrictive covenant, or confidentiality agreement related to that information. (*Id.* ¶¶ 38–39.)

On October 29, 2012, TME hired Defendant Brandy Kidd, who eventually took on overall management and supervisory responsibilities for TME's Illinois office in Addison, Illinois. (PSOAF ¶ 13.) As of 2020, Kidd was partially paid on a profit split, and received $295,169.74 in 2020. (*Id.*) Since 2020, and at Kidd's request, TME's Illinois office has used a separate Microsoft Office 365 email system for which Kidd was the administrator. (*Id.* ¶¶ 16, 70–71.) Each TME employee has their own email address. (*Id.*)

Beginning in October 2020, Kidd intended to start a separate freight broker company, which would become Defendant Top Shelf, and to quit her job at TME. (*Id.* ¶ 17.) In November 2020, Kidd formed Top Shelf in Illinois, listing the address for TME's Illinois office as Top Shelf's registered address. (*Id.* ¶ 22.) That month, Laddie Kop, an IT professional working for Kidd personally, set up a laptop computer for Kidd to use for Top Shelf, which also included access to TME's Office 365 email system. (*Id.* ¶ 20.)

Kop also set up a Top Shelf computer for Defendant Coreen Beeks, which likewise included the TME Office 365 email system. (*Id.* ¶ 23.) The email address associated with Beek's Dropbox account, which she used to manage TME invoices and other data, was changed from her TME-associated email address (coreen@shiptmeord.com) to one associated with Top Shelf (coreen@topshelfexp.com), though Beeks denied noticing that change. (*Id.* ¶ 24; Defendant's Joint Response ¶ 24.) In December 2020, Kop, at Kidd's direction, copied some emails from TME's email server to Top Shelf. (PSOAF ¶ 25.) On December 11, 2020, Top Shelf received broker authority from the Federal Motor Carrier Safety Authority ("FMCSA"). (*Id.* ¶ 26.)

In January 2021, Top Shelf computers used by Defendants David Craig and Laura Montanez were likewise set up, and included their TME email accounts. (*Id.* ¶ 27.) That month, Beeks also viewed Top Shelf's entry on the FMCSA website. (*Id.* ¶ 28.) Later that month, Kidd approached Ashley Holley of Hurley regarding leaving TME and setting up another brokerage company, including the possibility of a co-broker agreement between Hurley and Top Shelf related to the Sylectus system. (*Id.* ¶ 29.) Such an agreement would circumvent Sylectus' rules preventing Kidd and Top Shelf from registering with Sylectus for six months following termination by TME. (*Id.* ¶ 29.)

On February 9, 2021, Kidd instructed Kop to copy several customer distribution lists from TME's email system to Top Shelf's email system. (*Id.* ¶ 30.) Later that week, Kidd asked Kop to set up a meeting with Beeks to work on Top Shelf's QuickBooks system, adding, "I'll have [Beeks] use my login so it doesn't show she's active or knows what's going on." (*Id.* ¶ 31.) Kidd also texted Holley, "[Beeks] wants to do a call [with] us to get a visual of the accounting process." (*Id.* ¶ 32.)

In March 2021, Kidd corresponded with payroll provider ADP to set up payroll for Top Shelf and asked how "our unemployment" would work. (*Id.* ¶ 34.) Kidd also told Holley to set up email accounts at Hurley for Kidd, Beeks, Craig, and Montanez. (*Id.* ¶ 35.) On April 5, 2021, Kop sent an email to Kidd and Beeks (at Beeks' TME email address) asking Beeks to have Craig, Montanez, and herself "boot up and review their laptops this week." (*Id.* ¶ 38.) That same day, Kidd deleted the Dropbox account associated with her TME email address from her TME computer, though the account was still accessible from other computers. (*Id.* ¶ 39.) The Dropbox account's contents included subfolders titled "TM contracted rates," "TM marketing," "TM new accts," "TME cleared checks," 'tme expenses," and "TME Reports." (*Id.*) Kidd also emailed

ADP that day to confirm that Top Shelf's payroll should begin on April 12, 2021. (*Id.* ¶ 40.) On April 8, 2021, Kidd asked Kop to put TME's email system on Montanez's Top Shelf computer, which Kop confirmed had already been done. (*Id.* ¶ 41.)

Only five loads were booked through TME's Illinois office on April 8, 2021, and no loads were booked through that office on April 9, 2021. (*Id.* ¶ 42.) On April 9, 2021, Kidd asked Kop to "make my TME e-mail on my old [TME laptop] require a password and not just open," and Kop explained to Kidd how to do so. (*Id.* ¶ 43.)

At 5:03 p.m. on April 9, 2021, Kidd submitted her immediate resignation to TME's president, Tim McDonald. (*Id.* ¶ 44.) Beeks, Montanez, and Craig resigned shortly thereafter. (*Id.*) At 5:27 p.m. that day, Kidd sent a broadcast email to the customers of TME's Illinois office that the entire TME Chicago team was now at Top Shelf and would "continue moving your expedites Monday morning." (*Id.* ¶ 45.) In the weeks that followed, Kidd, Beeks, Craig, and Montanez had additional email correspondence with customers and carriers indicating that TME's Illinois office had become Top Shelf. (*Id.* ¶¶ 53, 55, 57.)

On April 10, 2021, TME staff went to TME's Illinois office and saw four computers present, but could not access TME's Office 365 email system due to it being password-locked. (*Id.* ¶ 46.) On April 12, 2021, TME called Kidd, Beeks, Craig, and Montanez and requested password information for its email system. (*Id.* ¶ 47.) This information was not provided to TME until the Court ordered it. (*Id.*)

Notwithstanding their resignations on April 9, 2021, Kidd, Beeks, Craig, and Montanez were able to view the incoming emails on their TME email accounts, which had been set up on their Top Shelf computers. (*Id.* ¶ 49.) On April 13, 2021, Kidd instructed Kop to change the TME email passwords for Beeks, Craig, and Montanez, as well as the credit card associated with

5

TME's email system. (*Id.* ¶ 50.) From around this time until October 11, 2021, Kidd, Beeks, Craig, and Montanez used their Top Shelf email accounts when sending emails to customers. (*Id.* ¶ 51.)

From April 13, 2021 to October 12, 2021, Top Shelf booked $3,479,588.52 in revenue through Hurley's Sylectus account.[3] (*Id.* ¶ 54; Defendants' Joint Response ¶ 54.) Top Shelf then qualified for its own Sylectus account (as six months had passed since Kidd and her co-employees left TME), and continued doing business. (PSOAF ¶ 65.)

Kidd's, Beeks', Craig's, and Montanez's Top Shelf computers continued to synchronize with TME's Outlook 365 email system until June 3, 2021, and an email was sent from Kidd's TME email address on June 2, 2021. (*Id.* ¶ 62.) Kidd does not recall accessing TME's Office 365 email system or forwarding the email on June 2, 2021. (Kidd SOAF,[4] ECF No. 166 ¶¶ 6–7.)

On June 4, 2021, this Court issued a Temporary Restraining Order that required Kidd to surrender computers. (PSOAF ¶ 63.) On June 8, 2021, Kidd deleted from her Dropbox account all files now alleged by TME to be trade secrets, including information related to TME's contracted rates, marketing information, Sylectus reports, and customer and account lists. (*Id.* ¶¶ 64, 67.) Kidd claims she deleted these files inadvertently. (Defendants' Joint Response ¶ 64.)

---

[3] Hurley did not do any actual business with Kidd or Top Shelf before April 9, 2021. (Hurley SOF, ECF No. 206 ¶ 13.)

[4] Plaintiff did not challenge Defendant's statement of additional facts related to Plaintiff's motion for summary judgment; Defendant's facts therefore are deemed admitted. N.D. Ill. L.R. 56.1(c)(2), (e)(3) ("Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material."); *see also Perry v. Sheet Metal Workers' Nat. Pension Fund*, No. 03 C 4729, 2004 WL 2211614, at *3 (N.D. Ill. Sept. 30, 2004) ("The court will deem any fact admitted in the opponent's statement of facts unless the fact is properly denied by the opposing party.").

## Discussion

As an initial matter, the parties have stipulated that (1) Plaintiff's claims against Defendant Top Shelf Transportation, LLC (which is distinct from Defendant Top Shelf Expediting, LLC) are dismissed without prejudice; (2) Counts 1, 2, and 3 are dismissed with prejudice as to Defendant Coreen Beeks; (3) Count 3 is dismissed with prejudice as to Defendants Craig and Montanez; and (4) Count 8 is dismissed with prejudice as to all Defendants. (ECF No. 188.) Therefore, Plaintiff's remaining claims are:

- Counts 1 and 2 against Defendants Kidd and Top Shelf;

- Counts 3, 4, and 7 against Defendant Kidd;

- Count 5 against Defendants Beeks, Craig, and Montanez;

- Count 6 against Defendants Beeks, Craig, Montanez, Top Shelf, and Hurley; and

- Count 9 against Defendants Kidd, Beeks, Craig, Montanez, Top Shelf, and Hurley.

The Court addresses the parties' various motions in turn:

- Plaintiff and Defendants' motions for summary judgment (ECF Nos. 127, 128, 137, 147);

- Plaintiff's motion for finding of contempt and for sanctions (ECF No. 142);

- Defendant Kidd and Top Shelf's motion to exclude the expert testimony of Stephen VanderBloemen (ECF No. 140); and

- Plaintiff's motion for leave to file certain documents under seal (ECF No. 194).

### 1. The Parties' Motions for Summary Judgment

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wackett v. City of Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011). A genuine dispute

of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020) (internal quotation marks omitted). "To defeat a motion for summary judgment, the party opposing it must make a 'showing sufficient to establish the existence of [any challenged] element essential to the party's case, and on which that party will bear the burden of proof at trial.'" *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893–94 (7th Cir. 2018) (quoting *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)). The court may not weigh conflicting evidence or make credibility determinations, but the party opposing summary judgment must point to competent evidence that would be admissible at trial to demonstrate a genuine dispute of material fact. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013).

In assessing the evidence at summary judgment, the court must consider the facts in the light most favorable to the non-moving party, giving that party "the benefit of all conflicts in the evidence and reasonable inferences that may be drawn from the evidence," regardless of whether it can "vouch for the objective accuracy of all" the evidence the non-moving party puts forward. *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 674 (7th Cir. 2014). Even though district courts must view the non-moving party's evidence in this generous light, it does not follow that they are "required to draw every requested inference; they must only draw reasonable ones that are

supported by the record." *Omnicare*, 629 F.3d at 704. "Inferences supported only by speculation or conjecture will not suffice." *Johnson*, 892 F.3d at 894.

Defendants have filed multiple motions for summary judgment, collectively challenging all of Plaintiff TME's claims. TME has filed a motion for partial summary judgment as to Count 3. The Court addresses each of TME's counts below.

### A.  Counts 1 and 2 (Misappropriation of Trade Secrets)

To prevail on its claims under the Defend Trade Secrets Act (DTSA) and Illinois Trade Secrets Act (ITSA), TME must show (1) the existence of a trade secret (2) that a defendant misappropriated the trade secret, and (3) that the trade secret was used in the defendant's business. *Sonrai Sys., LLC v. Waste Connections, Inc.*, 658 F. Supp. 3d 604, 613 (N.D. Ill. 2023) (citation omitted). Kidd and Top Shelf argue that the Court should dismiss TME's trade-secrets claims because TME cannot present a genuine issue of material fact as to whether TME had a protectable trade secret or whether they actually used any of the alleged trade secrets.

Under both the DTSA and the ITSA, information qualifies as a "trade secret" if "(1) the owner thereof has taken reasonable measures to keep such information secret and (2) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 540 (7th Cir. 2021) (internal quotation marks and citation omitted).

Kidd and Top Shelf claim that TME has no protectable trade secrets because TME has not identified what its purported trade secrets were and did not take reasonable efforts to maintain the secrecy of any alleged trade secrets. TME counters that its Sylectus reports, computer passwords, and customer distribution groups derive economic value from their secrecy;

and TME has taken reasonable efforts to protect those trade secrets by providing an employee handbook prohibiting disclosure of confidential information, keeping all Sylectus reports locked behind passwords, and providing logins only to employees and independent contractors who require it.

Here, TME has not taken reasonable measures to maintain the secrecy of its purported trade secrets, and thus cannot prove trade secrets misappropriation. "Courts evaluate the question of whether efforts to keep information confidential were sufficient on a case-by-case basis, considering the efforts taken and the costs, benefits, and practicalities of the circumstances." *DM Trans, LLC v. Scott*, 38 F.4th 608, 622 n.5 (7th Cir. 2022) (internal quotation marks and citations omitted). "In some circumstances, judgment as a matter of law for defendants is appropriate because it is readily apparent that reasonable measures simply were not taken." *Id.* This is such a case.

First, TME's employee handbook, which briefly stated that employees are prohibited from "[u]nauthorized use, theft or disclosure of the Company's confidential information," is not enough. (DSOF ¶ 28.) As TME admitted, the handbook does not define confidential information, and there is no record of TME ever identifying the information at issue as confidential or trade secrets to its employees.[5] (*See id.* ¶¶ 28–38.) The employee handbook thus "is too broad and vague to confer meaningful protection over the information at issue," TME lacked "an articulated and developed confidentiality policy," and it "did nothing to train or instruct employees as to their obligation to keep certain categories of information confidential." *Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888, 899 (N.D. Ill. 2019). Accordingly, a

---

[5] To the extent TME points to the confidentiality designations it has made during this litigation as evidence of its trade secrets, those self-serving and post-hoc designations do not raise a genuine issue.

reasonable jury could not find that TME reasonably maintained the confidentiality of its purported trade secrets based on its employee handbook.

Second, that TME's Sylectus information, including the reports it now claims were trade secrets, were locked behind a password is not enough—particularly where TME never identified Sylectus reports as confidential or took measures to safeguard those reports beyond the baseline password protection. *See Abrasic*, 364 F. Supp. 3d at 902 ("Perhaps the most telling evidence that CGW did nothing in particular to safeguard its supposed trade secrets is that it took no measures to protect that information that were in any way different (much less more exacting) than the steps that it took to protect information that was indisputably not a trade secret."); *see also Wayman Fire Prot., Inc. v. Premium Fire & Sec., LLC*, C.A. No. 7866-VCP, 2014 WL 897223, at *16 (Del. Ch. Ct. Mar. 5, 2014) (finding that "merely password protecting the [] information at issue" does not constitute "reasonable efforts to protect the confidentiality of that information," where there was no evidence that the plaintiff "conveyed to those to whom it gave passwords . . . that the [] information was highly confidential or secret").

Though TME claims that it provided login information only to employees and independent contractors who needed it, there is no material evidence that TME required those employees and contractors to maintain the confidentiality of the information they accessed. As already explained, TME never identified its purported trade secrets as confidential, and it further admits that none of its independent contractors signed restrictive covenants or confidentiality agreements despite their access to TME's purported trade secrets. (DSOF ¶ 39.) Ultimately, TME's undisputed efforts constituted a "laissez-faire approach to data security" that is inconsistent with trade secret protection. *Abrasic*, 364 F. Supp. 3d at 901 (citing cases). Therefore, no reasonable jury could find TME took reasonable efforts to maintain the

confidentiality of its purported trade secrets. *See Tax Track Sys. Corp. v. New Inv'r World, Inc.*, 478 F.3d 783, 788 (7th Cir. 2007) (affirming summary judgment of no breach of confidentiality agreement where the information "was not stamped 'Confidential'" and there was "widespread nonconfidential disclosure" of the information at issue).

Because the Court concludes as a matter of law that none of the information Defendants took could reasonably be considered a protectable trade secret, it does not reach whether there is a genuine issue of material fact for the other elements of TME's trade-secrets claims. The Court accordingly grants Defendants Kidd and Top Shelf's motion for summary judgment as to Counts 1 and 2 and dismisses those claims.

### B. Count 3 (Computer Fraud and Abuse Act)

TME and Kidd have filed cross-motions for summary judgment as to Count 3, which alleges Kidd violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030. For the reasons below, after considering the record in the light most favorable to TME, the Court grants summary judgment in Kidd's favor and dismisses Count 3.

Subsection 1030(a)(2)(C)[6] of the CFAA forbids a person from "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] information from any protected computer." 18 U.S.C. § 1030(a)(2) (cleaned up). Offenders are subject to not only criminal penalties, but also to civil liability in suits brought by their victims, "if the conduct involves 1 of the factors" listed in Subsection (c)(4)(A)(i)(I)–(V). 18 U.S.C. § 1030(g). Here, TME claims it falls under Subsection (I): "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I).

---

[6] Plaintiff's complaint also alleged that Kidd violated Subsection 1030(a)(4) of the CFAA, but Plaintiff has abandoned that ground in response to Kidd's summary-judgment challenge and thus has forfeited it. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597–98 (7th Cir. 2003).

TME argues that Kidd is liable under the CFAA as a matter of law based on its continued use of TME's Office 365 email system after her resignation on April 9, 2021 and that TME has lost over $5,000 from being locked out of that system from Kidd's resignation until Kidd provided TME with the relevant passwords months later.

At the outset, Kidd claims that Count 3 must be dismissed because TME's allegations for Count 3 made no mention of Kidd's alleged access to TME's Office 365 system after her resignation. On the merits, she adds that no reasonable jury could impose CFAA liability because TME's Office 365 system did not constitute a "computer," that she did not access the Office 365 system without authorization (because she had authorization to access the system during her employment, and did not access the system at all after she resigned), and because TME cannot show that it suffered any damage or loss from Kidd's conduct.

As an initial matter, the Court lacks a basis to find CFAA liability for Kidd's conduct during her employment at TME; TME itself focuses on Kidd's alleged post-employment conduct to claim CFAA liability. TME admits that prior to her resignation, Kidd, "as the head of the TME Illinois Office, was administrator of the Office 365 server" and thus could configure e-mail credentials including her own. (PSOF ¶¶ 5–8.) TME does not claim that Kidd was not authorized to change her own password on the e-mail system—it instead claims that Kidd did so for an improper purpose and that any authorization ended upon Kidd's resignation on April 9, 2021. (*Id.* ¶ 12.) The Court sees no basis to conclude that Kidd was not authorized to change her own password on the Outlook 365 system on April 9, 2021, even though it appears she did so to prepare for her resignation later that day and lock out TME from its own email system. *See Van Buren v. United States*, 141 S. Ct. 1648, 1662 (2021) (finding no violation where an employee

"could use the system to retrieve license-plate information . . . even though he obtained information from the database for an improper purpose").

Next, the Court agrees with Kidd that TME's remaining CFAA theory—which focuses on Kidd's post-resignation conduct—was not pled in its complaint. TME's complaint alleged a CFAA violation under 28 U.S.C. § 1030(a)(2)(C) based solely on Kidd's (and her dismissed co-defendants') access to TME's laptop computers during their employment at TME—it alleges that Kidd's unauthorized access occurred before she changed the passwords on TME's laptop computers and then resigned. (*See* ECF No. 1 ¶¶ 83–86 ("The Individual Defendants intentionally accessed TME's laptop commuters without authorization or exceeded their respective authorization . . . . The Individual Defendants *then* modified the passwords . . . in order to prevent their violations of [the CFAA] from readily being discovered or detected by TME[.].") (emphasis added).) Nowhere does Count 3 allege that Kidd violated the CFAA based on any post-resignation access to the Office 365 system—which TME now points to as the basis for CFAA liability—and TME has not explained why its new claim nonetheless should be considered. *See Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 490 (7th Cir. 2023) ("[A] district court retains discretion to treat new claims presented for the first time in briefing as a constructive motion to amend. It will rarely be appropriate to do so.") Therefore, dismissal of TME's CFAA claim is appropriate.

Nevertheless, the Court analyzes the parties' merits arguments and finds that Count 3 likely would fail even if it covered Kidd's post-resignation use of the Outlook 365 system.

The Court agrees with TME that its Outlook 365 email system is a "computer" for purposes of the CFAA. The CFAA defines a "computer" as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or

storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." 18 U.S.C. § 1030(e)(1). This definition includes cloud services such as TME's Outlook 365 system, which constitutes a "data storage facility or communications facility directly related to or operating in conjunction with" TME's physical computers. *See Hill v. Lynn*, No. 17 C 06318, 2018 WL 2933636, at *3 (N.D. Ill. June 12, 2018) ("Consistent with the plain language of the statute, most courts hold that unauthorized access to web-based accounts can form the basis of a CFAA violation[.]") (citing cases); *ACW Flex Pack LLC v. Wrobel*, No. 22-cv-6858, 2023 WL 4762596, at *6 (N.D. Ill. July 26, 2023) ("ACW has plausibly alleged that by accessing the data on Microsoft's 365 cloud services, Defendants accessed a 'computer' as defined by the [CFAA].") ; *see also Feldman v. Comp Trading, LLC*, No. 19-CV-4452 (RPK) (RLM), 2021 WL 930222, at *6 (E.D.N.Y. Mar. 11, 2021) (finding that "the Microsoft 365 cloud server" can support a CFAA claim).

The parties dispute whether Kidd accessed TME's Outlook 365 email system following her resignation. TME points to an email that was forwarded from Kidd's TME email account to her Top Shelf email account on June 2, 2021, arguing that Kidd forwarded that email and thus accessed TME's Outlook 365 email system without authorization. (*See* PSOF ¶ 15; ECF No. 149-5, Ex. L.) Kidd admits that she was not authorized to access the email system as of June 2, 2021, but claims that she does not recall accessing the email system or forwarding the email in question and had no reason to do so, and that TME has not shown that she did in fact access and forward the email in question. (PSOF ¶ 12, Kidd SOAF ¶¶ 6–8.) This presents a factual dispute for a jury that precludes summary judgment in either party's favor as to whether Kidd accessed TME's email system following her resignation. *See Anderson*, 477 U.S. at 248 ("[S]ummary

judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

Nevertheless, TME's Count 3 fails because there is no evidence that TME suffered any loss resulting from Kidd's alleged post-resignation use of its Office 365 email system. Putting aside Kidd's separate challenge to the analysis by TME's damages expert, TME argues it suffered a loss of more than $5,000 due to being locked out of its Office 365 email system upon Kidd's departure. However, it has not claimed any loss or damage based on the single email Kidd allegedly forwarded from her TME email account to her Top Shelf email account on June 2, 2021. To bring its CFAA claim, TME must show that Kidd's allegedly violative conduct involved a "loss . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I), 1030(g). TME has made no attempt to show that the lone email in question resulted in any loss to TME, much less a loss of at least $5,000, to maintain its CFAA claim—Count 3 thus must be dismissed.

Separately, TME argues that Kidd accessed its e-mail system without authorization when she directed Kop to change the e-mail passwords for Beeks, Craig, and Montanez on April 13, 2021—after her resignation and loss of authorization for the system a few days prior. (*See* PSOF ¶¶ 12–14.) Kidd does not contest the underlying facts, but instead claims she did not herself access the server but instead merely directed Kop to do so and to change the passwords. That argument fails—Kidd need not literally enter the relevant keystrokes to be found to have accessed the e-mail system, and there is no dispute that Kop was carrying out Kidd's instructions in accessing the system and changing the passwords at Kidd's direction. *See Motorola, Inc. v. Lemko Corp.*, 609 F. Supp. 2d 760, 770 (N.D. Ill. 2009) (finding sufficient CFAA allegations against a party where access allegedly was carried out on behalf of the party).

However, it is not clear that TME suffered any damage or loss from Kidd's access of the e-mail system and modification of Beeks', Craig's, and Montanez's passwords on April 13, 2021. TME argues that it suffered damage and loss under CFAA due to the months-long interruption and associated response costs it suffered upon being locked out of its Outlook 365 e-mail system. TME claims this lockout was triggered on April 9, 2021, when Kidd changed her own email password and then resigned. Thus, it seems that Kidd's actions on April 13, 2021, caused no further issues—the damage was already done on April 9 and so changing other passwords had no additional impact on TME and its e-mail system. (*See* ECF No. 149-1 ¶ 9 (indicating that TME's "complete interruption in service to the email system" began on April 9, 2021).) Nevertheless, and as already explained, Kidd's post-resignation conduct falls outside TME's CFAA claim, so the court need not resolve the merits of whether Kidd may have violated the CFAA when she directed Kop to change Beeks', Craig's, and Montanez's passwords on April 13, 2021.

Accordingly, the Court grants Kidd's motion for summary judgment as to Count 3 and denies TME's motion for partial summary judgment.

### C. Count 4 (Breach of Duty of Loyalty as to Kidd)

"Under Illinois law, employees as well as officers and directors owe a duty of loyalty to their employer." *Beltran v. Brentwood N. Healthcare Ctr., LLC*, 426 F. Supp. 2d 827, 831 (N.D. Ill. 2006) (citations omitted). The scope of that duty "may vary depending on whether a corporate officer or an employee is involved," and the duty may prohibit officers and employees "from improperly competing with their employer, soliciting the employer's customers, enticing co-workers away from the employer, diverting business opportunities, engaging in self-dealing and/or otherwise misappropriating the employer's property or funds." *Id.* To prove a breach of a fiduciary duty under Illinois law, a plaintiff must show (1) the existence of a fiduciary duty, (2) a

breach of that duty, and (3) damages proximately caused by the breach. *Alonso v. Weiss*, 932 F.3d 995, 1001 (7th Cir. 2019).

At this summary-judgment stage, the Court concludes that Kidd's role at TME was akin to that of a corporate officer rather than of a mere employee. Kidd does not contest that she owed a duty of loyalty to TME, and is it undisputed that she "was entrusted with overall management and supervisory responsibility" for TME's Illinois office and was the administrator of its Outlook 365 email system, and a portion of her pay was based on a profit split. (PSOF ¶¶ 13, 16.) When construing the facts in TME's favor, these circumstances establish that Kidd performed "significant managerial and supervisory responsibilities for the operation of the . . . office." *Aon Risk Servs., Inc. of Ill. v. Shetzer*, No. 01 C 7813, 2002 WL 1989466, at *4 (N.D. Ill. Aug. 27, 2002) (quoting *Everen Sec., Inc. v. A.G. Edwards & Sons, Inc.*, 308 Ill. App. 3d 268, 276, 719 N.E.2d 312, 318 (3d Dist. 1999)). Therefore, Kidd owed a fiduciary duty of loyalty to TME not to exploit her position for her personal benefit or hinder TME's ability to continue its business. *See Aon Risk Servs.*, 2002 WL 1989466, at *4.

TME has offered sufficient evidence that Kidd breached her duty of loyalty to avoid summary judgment. Kidd does not dispute that she locked TME out of its email system upon her departure but could view emails herself, used TME's address as the registered address for Top Shelf, copied TME customer-distribution groups, and had at least some pre-resignation communications with others about Top Shelf, though Kidd claims these constituted mere preparation of Top Shelf to compete, rather than active competition. (*See, e.g.*, PSOF ¶¶ 22, 30–36, 41, 43, 49, 62.) When viewing the evidence in the light most favorable to TME, a reasonable jury could conclude that Kidd breached her duty of loyalty to TME given her managerial and supervisory role at TME.

As to damages, TME asserts that it is at least entitled to recover the salary it paid Kidd while she allegedly breached her duty of loyalty. *See Sheth v. SAB Tool Supply Co.*, 2013 IL App (1st) 110156, ¶ 88, 990 N.E.2d 738, 758 (1st Dist. 2013) ("[D]uring the time in which an agent breaches his or her fiduciary duty, a complete forfeiture of the agent's salary is required as a matter of public policy."). Kidd does not challenge this and instead focuses solely on the independent damages calculation of TME's expert. Therefore, aside from any issues with the report of TME's expert, TME has support for damages related to Kidd's salary while she was at TME. The Court thus denies Kidd's motion for summary judgment as to Claim 4.

### D. Count 5 (Breach of Duty of Loyalty as to Beeks, Craig, and Montanez)

Defendants Beeks, Craig, and Montanez jointly move for summary judgment as to TME's Count 5 alleging that they breached their own fiduciary duties of loyalty to TME. At the outset, TME concedes that these defendants lacked the managerial and supervisory status of Kidd, and thus they had lesser obligations toward TME than did Kidd.

As to Craig and Montanez, TME largely speculates that they were aware of Top Shelf while still at TME, had been solicited by Kidd, and prepared to resign and join Top Shelf for months rather than reporting Kidd's planned exodus to TME. TME points to evidence of Kidd's communications with Kop and others as early as January 2021 to set up computers, accounts, and payroll for Craig and Montanez, and the fact that TME's Illinois office was bare after its employees resigned on April 9, 2021. TME infers that Craig and Montanez must have known about Top Shelf and agreed to join that company well before Kidd resigned on April 9, 2021.

TME's evidence is too tenuous to avoid summary judgment. Though the evidence shows Kidd was preparing Top Shelf equipment and accounts for both Craig and Montanez, there is no evidence that Craig or Montanez knew of and supported those efforts, especially to such an

19

extent to indicate a breach of their duties of loyalty to TME. *See Aon Risk Servs.*, 2002 WL

1989466, at *4 ("Employees may compete with their former employers provided they did not

commence *demonstrable business activity* before terminating their employment." (emphasis

added)). Indeed, TME's own witnesses testified that they have no evidence that Beeks, Craig, or

Montanez solicited its customers, were solicited by Kidd and accepted jobs at Top Shelf before

resigning at TME, or booked loads for Top Shelf while still at TME. (*See* Beeks SOF, ECF No.

192 ¶¶ 50–53.) Though the Court construes the facts and reasonable inferences in TME's favor at

this stage, it does not adopt TME's speculation to uphold Count 5 as to Craig or Montanez. *See*

*Consolino v. Towne*, 872 F.3d 825, 830 (7th Cir. 2017) ("[S]peculation is not enough to create a

genuine issue of fact for the purposes of summary judgment."); *Chicagoland Aviation, LLC v.*

*Todd*, No. 12 C 1139, 2012 WL 5949358, at *6 (N.D. Ill. Nov. 27, 2012) ("[T]here is no evidence

that Todd began actually competing with Plaintiff while still employed[.]").

As to Beeks, TME similarly infers from Kidd setting up email and Dropbox accounts for

Beeks in November 2020, at which time Beeks was aware that Kidd was forming a new

company, that Kidd had already solicited Beeks and Beeks had agreed to work for Top Shelf.

TME particularly notes that Beeks received an email in her TME email account from Dropbox

confirming that her TME Dropbox account had been rerouted to coreen@topshelfexp.com

instead (though Beeks denies ever seeing that email). Kidd also set up a computer for Beeks

before resigning on April 9, 2021, which TME says suggests that Beeks had already agreed to

join Top Shelf before that date. In January 2021, Beeks accessed entries for Top Shelf on the

Federal Motor Carrier Safety Authority website. Kidd also texted Kop on February 10, 2021 to

set up a meeting with Beeks, and planned to use Kidd's login information so TME could not

discover that Beeks "knows what's going on," though there is no further indication that such a meeting actually took place. (PSOF ¶ 31.)

The Court doubts whether the inference requested here amounts to anything more than mere speculation, but regardless, TME lacks material evidence that Beeks carried out "demonstrable business activity" for Top Shelf before resigning at TME. At most, Beeks was aware that Kidd was forming a competing business and perhaps was interested in joining that business once it was set up. But TME merely speculates that Beeks competed against TME before she formally resigned and joined Top Shelf on April 9, 2021, which is not enough to escape summary judgment. Further, and contrary to TME's assertion, TME has not presented evidence to establish that Beeks, as a mere employee, not an officer, director, etc., was obligated to report Kidd's formation of Top Shelf to others at TME to fulfill her duty of loyalty based on TME's cited caselaw. *Cf. Unichem Corp. v. Gurtler*, 148 Ill. App. 3d 284, 291, 498 N.E.2d 724, 728 (4th Div. 1986) (discussing breach of fiduciary duty by a "corporate officer"); *see also Preferred Meal Sys., Inc. v. Guse*, 199 Ill. App. 3d 710, 725, 557 N.E.2d 506, 515 (1st Dist. 1990) ("*[C]orporate officers* are liable for breaching their fiduciary duties where, while still employed by the company, the officer has . . . failed to inform his employer that other employees were forming a rival company[.]").

The Court therefore grants summary judgment for Beeks, Craig, and Montanez as to Count 5 and dismisses Count 5.

### E. Count 6 (Aiding and Abetting Breach of Duty of Loyalty)

To support a claim for aiding and abetting Kidd's fiduciary duty of loyalty, TME must show that (1) Kidd performed a wrongful act causing an injury; (2) each Defendant was regularly aware of its role as part of Kidd's activity at the time it assisted Kidd; and (3) each Defendant

knowingly and substantially assisted Kidd's principal violation. *See Symbria, Inc. v. Callen*, No. 20-cv-4084, 2022 WL 60530, at *18 (N.D. Ill. Jan. 6, 2022). Given the Court's above conclusion that a jury could conclude that Kidd breached her duty of loyalty, it focuses on the latter two elements.

At the outset, the Court agrees with Top Shelf that it cannot "aid and abet" Kidd because Top Shelf is wholly owned by Kidd and thus would illogically be aiding and abetting itself. TME does not argue otherwise or claim any basis to find Top Shelf liable, and the Court thus grants summary judgment for Count 6 as to Top Shelf. *See Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.").

Next, for the same reasons that the Court concluded that Beeks, Craig, and Montanez did not breach their fiduciary duties while employed at TME due to their lack of Top Shelf-related activities, TME has not presented evidence that they or any of those Defendants knowingly and substantially assisted Kidd with her potential breach or her own fiduciary duty of loyalty before she resigned on April 9, 2021. There is no evidence that Beeks, Craig, or Montanez meaningfully helped Kidd lock TME out of its own email system, put together Top Shelf's registration documents, or copy TME customer-distribution lists, or that they otherwise provided substantial assistance to Kidd's alleged breach of her fiduciary duty. Therefore, summary judgment in those Defendants' favor as to Count 6 is appropriate.

As to Hurley, the Court first notes that TME's opposition brief to Hurley's motion for summary judgment does not "cite directly to specific paragraphs in the LR 56.1 statements or responses" when offering facts it claims preclude summary judgment. N.D. Ill. L.R. 56.1(g); *see also Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*, 343 F. Supp. 3d 789, 793 (N.D. Ill. 2018) ("The

Court is entitled to require strict compliance with Local Rule 56.1[.]") (citing *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015)). TME undoubtedly knows these citations are required, as it includes them when opposing other parties' motions for summary judgment. Though TME's singular failure to follow the Court's local rules when opposing Hurley could warrant striking large portions of TME's opposition brief and result in summary judgment in Hurley's favor, the Court considers the merits of TME's arguments.

There is evidence that Hurley was generally aware of Kidd's intention to set up Top Shelf and assisted her in doing so. However, TME does not present material evidence that Hurley knowingly and substantially assisted specifically in her specific tortious conduct. TME concedes that Kidd could lawfully plan to compete with TME while still employed there, but could not, for example, solicit other employees before resigning. The actions TME then points to for Hurley's purported substantial assistance to Kidd are only those taken to set up Top Shelf to eventually compete, such as preparing a Sylectus account under a co-broker agreement between Top Shelf and Hurley (to avoid a six-month waiting period upon Kidd's resignation) and providing email and phone support, particularly after Kidd's resignation at TME. They do not include knowing and substantial assistance with Kidd's allegedly tortious conduct, such as locking TME out of its email system or copying TME's customer-distribution lists. TME also admits that Hurley did not do any actual business with Kidd or Top Shelf before Kidd resigned on April 9, 2021, and believed that Kidd was not subject to any contractual non-competition or non-solicitation obligations. (Hurley SOF ¶¶ 13, 19–21.) Therefore, while Hurley helped Kidd set up Top Shelf generally, there is no material evidence that it knowingly and substantially assisted her with any actions that breached her duty of loyalty to TME. The Court therefore grants Hurley's motion for summary judgment as to Count 6 and dismisses Count 6 in its entirety.

## F. Count 7 (Fraud)

TME's Count 7 alleges fraud against Kidd only, related to allegedly false representations Kidd made to TME regarding profits at TME's Illinois office that impacted her compensation, which included a split of TME's profits. "To establish fraud, a plaintiff must prove (1) a false statement or omission of a material fact; (2) knowledge or belief of the falsity by the party making it; (3) intention to induce the other party to act; (4) action by the other party resulting in reliance on the truth of the statements; and (5) damage to the other party resulting from such reliance." *Lindy Lu LLC v. Ill. Cent. R. Co.*, 2013 IL App (3d) 120337, ¶ 26, 984 N.E.2d 1171, 1176 (3d Dist. 2013) (citing *Bd. of Educ. of City of Chicago v. A, C & S, Inc.*, 131 Ill.2d 428, 452, 546 N.E.2d 580 (Ill. 1989)). Kidd argues that several of these elements lack factual support, including that Kidd made a false statement or had fraudulent intent, that TME reasonably relied on Kidd's statements, and that there are provable damages.

In its brief response, TME argues only that it relied on Kidd's reports and that it has established damages. It does not address the other challenged elements, including that Kidd made a false statement and that she knew the statement was false, or offer facts from which a reasonable jury could find in its favor on those elements. Summary judgment in Kidd's favor thus is appropriate. *See Falcon v. City of Chicago*, No. 17-cv-05991, 2021 WL 1222869, at *5 (N.D. Ill. Mar. 31, 2021). Accordingly, the Court grants summary judgment in Kidd's favor as to TME's fraud claim and dismisses Count 7.

## G. Count 9 (Civil Conspiracy)

To prove civil conspiracy under Illinois law, TME must show "(1) an agreement between two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means; and (2) at least one tortious act by one of the co-conspirators in

furtherance of the agreement that caused an injury to the plaintiff." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509 (7th Cir. 2007). Given the Court's above conclusion that there is material evidence that Kidd breached her fiduciary duty of loyalty to TME (such as by locking TME out of its email system), the Court's analysis focuses on whether any of the other Defendants agreed with Kidd to accomplish this breach to form a conspiracy. TME ultimately "must show that each of the defendants knowingly and voluntarily participated in a common scheme to commit an unlawful act or a lawful fact in an unlawful manner." *Mosley v. City of Chicago*, 614 F.3d 391, 400 (7th Cir. 2010) (internal quotation marks and citation omitted).

TME's conspiracy claim fails for the same reasons as its claims that other Defendants aided and assisted Kidd's alleged breach of her fiduciary duty of loyalty. Just as TME lacks evidence that other Defendants knowingly and substantially assisted Kidd in tortious acts, TME lacks evidence that any other Defendant conspired to, for example, lock TME out of its email system or copy TME's customer information. Though TME has offered material evidence that Kidd took specific actions that breached her duty of loyalty to TME prior to her resignation, it has not offered evidence from which a reasonable person could conclude that any of the other defendants knowingly and voluntarily agreed with Kidd to accomplish that purpose to form a conspiracy. *See Turner v. Hirschbach Motor Lines*, 854 F.3d 926, 930 (7th Cir. 2017) ("An agreement is a necessary and important element of this cause of action, and a defendant who innocently performs an act which happens to fortuitously further the tortious purpose of another is not liable under the theory of civil conspiracy." (internal quotation marks and citation omitted)). The Court thus grants summary judgment in Defendants' favor and dismisses Count 9.

In sum, the Court dismisses all of TME's claims with the sole exception of Count 4 against Defendant Kidd.

## 2. Plaintiff's Sanctions Motion

TME moves for a finding of civil contempt and sanctions against Kidd under Federal Rule of Civil Procedure 37(e) based on Kidd's destruction of electronically stored information ("ESI"). Kidd permanently deleted TME-related files in a Dropbox cloud account that were subject to the Court's Temporary Restraining Order requiring her to surrender "all computer devices, cellphones and other electronic devices, email and cloud accounts . . . to determine the manner in which [Defendants] retained, accessed, used and/or disseminated any of TME's files claimed or alleged to be proprietary and trade secret information." (TRO, ECF No. 19 at 2.) Kidd claims that she deleted those files from one computer as part of preparing that computer for a new employee, and did not realize that her deletion would extend beyond that computer and result in the files being permanently inaccessible across the Dropbox account, in violation of the TRO. (Kidd Aff., ECF No. 172 ¶¶ 8, 10.) For the reasons below, the Court grants in part and denies in part TME's motion.

Federal Rule of Civil Procedure 37(e) provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> > (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> >
> > (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> >
> > > (A) presume that the lost information was unfavorable to the party;
> > >
> > > (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> > >
> > > (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

Thus, Rule 37(e) has five threshold requirements that must be met: "(1) the information must be ESI; (2) there must have been anticipated or actual litigation that triggers the duty to preserve ESI; (3) the relevant ESI should have been preserved at the time of the litigation was anticipated or ongoing; (4) the ESI must have been lost because a party failed to take reasonable steps to preserve it; and (5) the lost ESI cannot be restored or replaced through additional discovery." *DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 958 (N.D. Ill. 2021) (citations omitted). Further, the Court may order curative measures only if TME was prejudiced by Kidd's actions, and may impose default judgment or a remedial instruction only if Kidd acted with the intent to deprive TME of the use of the Dropbox files in this case. *See id.*

The only threshold requirement Kidd disputes is whether the Dropbox files at issue here could be restored or replaced. According to Kidd, the deleted information, including the Sylectus reports, were in TME's possession, and only the files' contents, rather than their metadata, are the subject of Rule 37(e).

The Court disagrees. First, though some of the files Kidd deleted, such as the Sylectus reports, can be reproduced, many other files were deleted and Kidd does not satisfactorily explain that all relevant deleted files—rather than merely the Sylectus reports—are replaceable. Second, the metadata associated with Kidd's deleted Dropbox versions of the Sylectus reports is relevant to TME's trade-secrets claims, especially because the TME counts those reports themselves among the trade secrets it alleges Kidd misappropriated. As Kidd admits, the metadata would at least show when Kidd copied and accessed the Sylectus reports and thus be relevant to Kidd's alleged misappropriation of those claimed trade-secrets (had the Court not dismissed TME's trade-secrets claims on other grounds). Kidd further is mistaken in believing

that metadata is not ESI covered by Rule 37(e), when in fact metadata "may be just as critical, if not more so, as the content" and is within the purview of ESI covered by the rule. *Snider v. Danfoss, LLC*, No. 15 CV 4748, 2017 WL 2973464, at \*4 & n.10 (N.D. Ill. July 12, 2017) (adding, "[a]lthough the rule speaks of the lost ESI, more accurately it is the loss of the content of or information contained in the ESI that appears to be the focus"), *report and recommendation adopted by* 2017 WL 3268891 (N.D. Ill. Aug. 1, 2017). Due to Kidd's conduct, the metadata related to the Sylectus reports is now gone—all threshold requirements thus have been met, and the Court therefore turns to whether Kidd had the necessary intent to warrant sanctions under Rule 37(e)(2), or whether TME was prejudiced to warrant curative measures under Rule 37(e)(1).

There is little evidence that Kidd acted with the requisite intent when she deleted Dropbox files off her laptop computer. In defending her actions, Kidd has explained that she did not understand that the Dropbox account was a "cloud account" for purposes of the TRO, and that she "did not understand at the time that the deletions [of Dropbox files] would remove the information from Dropbox so no one could access it from anywhere. I assumed that all of the information would still be available on the Dropbox on my laptop that was sent to be imaged per the [TRO]." (Kidd Aff., ECF No. 172 ¶¶ 4, 8.) Ultimately, she claims that she "simply did not understand the nature of Dropbox," and that she would not have deleted the Dropbox files had she known how Dropbox worked. (*Id.* ¶ 8.)

Though Kidd was obligated to follow the TRO and preserve the Dropbox files, and made a serious error in failing to do so in direct violation of the Court's TRO, it appears that her violation was a result of negligence rather than an intention to deprive TME of those files. Therefore, the Court will not enter default judgment or provide a remedial instruction under Rule

37(e)(2). Further, as explained above, TME's trade-secrets claims fail because TME failed to take reasonable measures to keep its purported trade secrets confidential as a matter of law, which is unrelated to the deleted files targeted by TME's motion for sanctions. Thus, TME's request for a default judgment or remedial instruction is moot.

Still, the Court does find that TME was prejudiced by Kidd's deletion of evidence that she was ordered to maintain. "'Prejudice' under Rule 37(e) means that a party's ability to obtain the evidence necessary for its case has been thwarted," or that "parties are forced to unnecessarily litigate e-discovery issues" due to spoliation. *DR Distribs.*, 513 F. Supp. 3d at 981. Here, the deleted ESI included metadata that would at least indicate whether, and how much, Kidd used the Sylectus reports and other deleted files—which would of course inform TME's trade-secrets claims—and it also is possible that other files would contain evidence of Kidd's alleged misappropriation not otherwise reflected in the parties' discovery. *See DR Distribs.*, 513 F. Supp. 3d at 982 (finding prejudice where the "ESI went right to the core" of the plaintiff's claims). Indeed, it appears that the deleted files, if recovered, might have turned out to be replete with references to TME information at the center of this case—including its contracted rates, marketing efforts, customer accounts, reports, and financials. (*See* Swaminathan Aff., Ex. B, ECF No. 142-1.) The Court's conclusion that TME's trade-secrets claims fail on other grounds also does not preclude prejudice. Even though those claims are dismissed for the reasons described above, TME was prevented from developing certain aspects of those claims and was forced to investigate and seek remediation due to Kidd's spoliation of relevant evidence. *See DR Distribs.*, 513 F. Supp. 3d at 981. By Kidd's contrary logic, a party would be off the hook for destroying relevant evidence as long as it succeeded on grounds unrelated to that evidence, like Kidd does here. Such a perverse result would undermine Rule 37(e)'s mechanism to address a

party's failure to preserve ESI regardless of the ultimate outcome of the case on the merits. That Kidd has defeated TME's trade-secrets claims on certain elements does not excuse her ESI conduct that prejudiced TME's case as to other elements.

Accordingly, the Court finds that TME has suffered prejudice from Kidd's destruction of Dropbox files, and will order curative measures against Kidd to account for the prejudice her actions imposed on TME. The deleted evidence is now unrecoverable, and TME specifically requests an award of its costs and expenses incurred in uncovering and proving the destruction of evidence, including forensic costs and attorney's fees. The Court agrees with this request in principle though it does not yet know what award TME will request or for what particular fees and costs. Nevertheless, the Court concludes that awarding TME its fees and costs reasonably necessary to uncover and address Kidd's destruction of evidence "ameliorates the economic prejudice imposed" on TME "and also serves as a deterrent to future spoliation." *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 502 (S.D.N.Y. 2016). The parties therefore shall confer in good faith regarding what costs and fees were reasonably incurred by TME and attempt to reach agreement. If the parties do not reach agreement, TME may then submit a petition for the fees and costs it believes it is entitled to.

Because Rule 37(e) provides adequate authority to impose sanctions related to Kidd's conduct here, the Court does not rely on its inherent authority as the grounds for its sanctions against Kidd—even assuming the Court has such authority in the first place. *See DR Distribs.*, 513 F. Supp. 3d at 949.

Accordingly, the Court grants in part and denies in part TME's motion for finding of contempt and for sanctions.

### 3. Kidd and Top Shelf's *Daubert* Motion

Defendants Kidd and Top Shelf seek to exclude the opinions of TME's damages expert, Stephen VanderBloemen, as unreliable.[7] Specifically, they challenge his opinions in (1) applying a ten-year period of TME's future earnings; (2) incorporating a "residual" value into his calculations; (3) applying a projected 1.25% growth rate to TME's business for the ten-year period; (4) using a discounted-cash-flows model to calculate TME's lost value; and (5) incorporating various other assumptions, including that TME was not doing business with any former customers from its Illinois office after Kidd resigned. TME counters that Mr. VanderBloemen's report uses reliable methodology and that Defendants' critiques go to the weight, rather than the admissibility, of his testimony. The Court agrees with Defendants that TME has not shown that Mr. VanderBloemen's opinions regarding TME's loss caused by Defendants are reliable.

"The admission of expert testimony is governed by Federal Rule of Evidence 702 and the principles outlined in *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)]." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). Rule 702 requires that the district judge act as a "gate-keeper who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741 (7th Cir. 2007) (quoting *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006) (cleaned up)); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–49 (1999); *Daubert*, 509 U.S. at 589. Federal Rule of Evidence 702 provides as follows:

---

[7] Defendants' motion challenges only Mr. VanderBloemen's opinions as to the damages to Plaintiff allegedly caused by Defendants, which relate to Plaintiff's claims. The motion does not challenge Mr. VanderBloemen's opinions as to the commissions due to or from Kidd, which relate to Kidd's counterclaims against Plaintiff.

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The rule imposes "three basic prerequisites." 4 *Weinstein's Federal Evidence* § 702.02[3]. "Under Federal Rule of Evidence 702 and *Daubert,* the district court must . . . determine [1] whether the witness is qualified; [2] whether the expert's methodology is . . . reliable; and [3] whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (quoting *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007)). "A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005).

"The party seeking to introduce the expert witness testimony bears the burden of demonstrating that the expert witness testimony satisfies the *Daubert* standard by a preponderance of the evidence." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 782 (7th Cir. 2017). District judges possess considerable discretion in dealing with expert testimony. *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141–43 (1997) (holding that abuse of discretion standard applies in reviewing district court rulings on admissibility of Rule 702 opinion testimony). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existed data only by the *ipse dixit* of the expert." *Id.* at 146.

In Mr. VanderBloemen's one-page analysis of the damages Defendants allegedly caused TME, and his accompanying exhibits and workpapers, he purports to explain his methodology that arrives at approximately $3.6 million in damages. (VanderBloemen Report, ECF No. 138-8 pp. 135–42.) His methodology applies a discounted-cash-flows analysis that calculates the present value of TME's Illinois business as of Kidd's resignation on April 9, 2021, based on its projected future earnings and applying various normalization factors and discounts. (*See id.*) In particular, he calculates TME's projected future earnings over ten years, adds a "residual" value of between approximately $1.35 million and $1.66 million, and ultimately concludes after applying other factors that TME's total loss of value due to Defendants' actions was around $3.6 million. (*Id.* p. 142; ECF No. 176-2.) Among other things, Defendants argue that Mr. VanderBloemen's use of a ten-year future earnings period and of a "residual" is not reliable.

Mr. VanderBloemen's report does not explain why he applied a ten-year period for TME's future cash flows or why or how he calculated the additional residual value. When asked about his analysis at deposition, Mr. VanderBloemen explained that he did not rely on any authoritative sources or consider the relevant industry to conclude that a ten-year period was appropriate for his discounted-cash-flows analysis, but that it was based on his judgment and "just came out of the blue." (VanderBloemen Dep. Tr., ECF No. 138-8 at 68:16–25, 147:20–148:5, 149:25–150:14.) Mr. VanderBloemen similarly stated that his reason for using a residual was "just my judgment, which I've used in the past," and was "not aware of any literature" or guidance for using one, nor did he have a reason for not referencing the residual in his report. (*Id.* at 234:19–236:4, 237:13–19.)

In its response brief, TME barely addresses these issues, merely claiming that (1) ten years is a reasonable assumed period for Mr. VanderBloemen's discounted-cash-flows analysis

because TME's Illinois office had already been in business for eight years; and (2) Defendants and their expert haven't adequately explained why a residual value *shouldn't* be applied. This misses the mark. Nowhere has Mr. VanderBloemen explained why he applied a ten-year future earnings period (Why not five years? Why not fifteen?), or how he calculated his "residual" values or what they represent. TME itself bears the burden of establishing the reliability of Mr. VanderBloemen's opinions, and it has offered no real indication that those opinions are reliable, instead concluding that the Court should accept them based on Mr. VanderBloemen's many years of experience. The Court does not simply assume an expert's opinions are reliable and place the burden on the challenging party to prove otherwise, and will not allow an expert to offer opinions to the jury that are based merely on the expert's own say-so. Neither TME nor Mr. VanderBloemen pointed to any *Daubert* factors, such as whether Mr. VanderBloemen's methodology has been tested, subject to peer review or publication, or has attracted widespread acceptance, or anything else indicating that his discounted-cash-flows analysis is reliable by a preponderance of the evidence. Therefore, Mr. VanderBloemen's damages calculation is unreliable based on his discounted-cash-flows analysis, and the Court does not address Defendants' other challenges to Mr. VanderBloemen's opinions.

Accordingly, the Court grants Defendants' motion to exclude Mr. VanderBloemen's testimony and excludes Mr. VanderBloemen's opinions regarding damages to TME allegedly caused by Defendants. The Court does not exclude Mr. VanderBloemen's opinions regarding commissions due to or from Kidd, which Defendants have not challenged.

### 4. Plaintiff's Motion to Seal

Lastly, TME moves for leave to file under seal various exhibits designated "Confidential" or "Confidential Attorneys' Eyes Only." (ECF No. 194.) As TME knows, the Court previously

denied a motion by certain defendants for leave to file materials under seal because the defendants made no showing of good cause "other than to say that the exhibits are designated as 'Confidential' or 'Confidential-Attorneys' Eyes Only" pursuant to the Agreed Confidential Order." (ECF No. 151; *see also* ECF Nos. 194, 205 ("TME is aware of the Court's denial of the motion to seal made by the Defendants.").) Though TME acknowledges the Court's prior ruling, it repeats Defendants' error. TME's entirely conclusory argument is that the exhibits at issue have been designated as confidential under the confidentiality order and "contain financial information that would be inappropriate to make publicly available." (ECF No. 205 ¶ 6.) This falls well short of what this Court already explained is required: "A party hoping to file materials in secret must justify the claim of secrecy and analyze the applicable legal criteria or contend that any document may legitimately be kept from public inspection despite its importance to the resolution of the litigation." (ECF No. 151 (cleaned up).) TME makes no good-cause showing here, and the Court thus denies its motion to seal without prejudice. The Court nevertheless will allow the documents at issue to remain provisionally sealed for seven days following entry of this order to allow TME to file a properly supported motion to seal if it so chooses.

### Conclusion

The Court therefore:

- Grants Defendants Coreen Beeks, David Craig, and Laura Montanez's motion for summary judgment (ECF No. 127);

- Grants Defendant Hurley's motion for summary judgment (ECF No. 128);

- Grants in part and denies in part Defendants Kidd and Top Shelf's motion for summary judgment (ECF No. 137);

- Denies Plaintiff's motion for partial summary judgment (ECF No. 147);

- Grants in part and denies in part Plaintiff's motion for finding of contempt and for sanctions (ECF No. 142);

- Grants Defendant Kidd and Top Shelf's motion to exclude expert testimony (ECF No. 140); and

- Denies Plaintiff's motion for leave to file certain documents under seal (ECF No. 194).

The Court accordingly dismisses all of Plaintiff's claims except Count 4 and dismisses all Defendants except Defendant Kidd.

The Court orders the parties to submit a joint status report addressing how they intend to proceed by February 9, 2024. By that date, the parties further shall confer in good faith regarding what costs and fees were reasonably incurred by TME in uncovering and addressing Kidd's destruction of evidence and attempt to reach agreement regarding an award of those costs and fees. If the parties do not reach agreement, TME may then submit a petition for the fees and costs it believes it is entitled to.

Plaintiff may file a properly supported motion for leave to maintain ECF Nos. 196–203 under seal within seven days following entry of this order.

**SO ORDERED.**                                          **ENTERED: January 18, 2024**

**HON. JORGE ALONSO**

**United States District Judge**